UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

TIMOTHY L.[1],                              )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )        CIVIL NO.  1:21cv48
                                            )
KILOLO KIJAKAZI, Acting                     )
Commissioner of Social Security,            )
                                            )
            Defendant.                      )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for a period of

disability and Disability Insurance Benefits (DIB) as provided for in the Social Security Act. 42

U.S.C. § 423(a).  Section 405(g) of the Act provides, inter alia, "[a]s part of his answer, the

[Commissioner] shall file a certified copy of the transcript of the record including the evidence

upon which the findings and decision complained of are based.  The court shall have the power

to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the [Commissioner], with or without remanding the case for a

rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by

substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less

than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

---

[1]  To protect privacy, Plaintiff's full name will not be used in this Order.

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings. *Scott v. Astrue*, 734, 739 (7th Cir. 2011); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see also Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. Since the alleged onset date of disability, July 25, 2010, the claimant has had the following severe impairments: osteoarthritis of the first carpal metacarpal bilaterally, degenerative disc disease of the lumbar spine, asthma, status post bundle branch blockage, major depressive disorder; and obesity (20 CFR 404.1520(c) and 416.920(c)).

4. Since July 25, 2010, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that since July 25, 2010, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except can occasionally climb stairs, or ramps, balance, stoop, kneel, or crouch; can never climb ladders, ropes, scaffolds, or crawl. Can frequently handle and finger bilaterally. Must avoid concentrated exposure to extreme heat, extreme cold, humidity, wetness, fumes, dusts, odors, gases, and poor ventilation. With work that can be learned in 30 days, or less; with simple routine tasks, routine work place changes, simple work related decisions; and with occasional interaction with coworkers and supervisors, and no interaction with the general public. Work with a first to fourth grade reading level, and a first grade writing level.

6. Since July 25, 2010, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. On October 31, 2017, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Prior to October 31, 2017, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on October 31, 2017, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Prior to October 31, 2017, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    Beginning on October 31, 2017, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

12.    The claimant was not disabled prior to October 31, 2017, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

13.    The claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2014, the date last insured (20 CFR 404.315(a) and 404.320(b)).

(Tr. 19- 29).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review.  This appeal followed.

Plaintiff filed his opening brief on November 19, 2021.  On January 3, 2021, the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on January 17, 2022. Upon full review of the record in this cause, this court is of the view that the ALJ's decision must be remanded for an award of benefits.

A five-step test has been established to determine whether a claimant is disabled.  *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant
> presently unemployed? (2) Is the claimant's impairment "severe"?
> (3) Does the impairment meet or exceed one of a list of specific
> impairments? (4) Is the claimant unable to perform his or her
> former occupation? (5) Is the claimant unable to perform any other
> work within the economy? An affirmative answer leads either to
> the next step or, on steps 3 and 5, to a finding that the claimant is
> disabled. A negative answer at any point, other than step 3, stops
> the inquiry and leads to a determination that the claimant is not
> disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature

of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

In December 2013, Plaintiff filed an application for DIB. (Tr. 225-237). He reported he

became unable to work as of July 25, 2010. At that time he had attained the age category of

"closely approaching advanced age". (Tr. 237). He later filed an application for Supplemental

Security Income (SSI) benefits in October 2017, and that application is not at issue in this appeal.

(Tr. 498-505).

On behalf of SSA, the Indiana Disability Determination Bureau (DDB) denied Plaintiff's

application at the initial level in July 2014 and upon reconsideration in October 2014. (Tr.

225-235, 237-249). Following denials at the initial and reconsideration levels of review, ALJ

Katich held a hearing in May 2016 and issued an unfavorable decision in August 2016. (Tr.

156-223, 251-267). In August 2017, the Appeals Council granted review and remanded Plaintiff's

case for another hearing and a new decision. (Tr. 274-276). In January 2018 ALJ Katich

conducted another hearing and issued a second unfavorable decision in April 2018. (Tr. 278-304).

In November 2019, the Appeals Council again granted review, vacated the April 2018 decision,

and remanded the case to a different ALJ for a new hearing and decision. (Tr. 306-308). In March 2020, ALJ Winters conducted a third hearing. (Tr. 41-91). In April 2020, ALJ Winters issued a "Partially Favorable Decision" and issued the third hearing denial concerning Plaintiff's Title II application for DIB. (Tr. 12-40). This time SSA's Appeals Council denied review. (Tr. 1-5). Thereafter Plaintiff timely filed his complaint in this Court. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Plaintiff was born in 1960 and was considered an individual "closely approaching advanced age" as of his alleged disability onset date and attended school through the 9th grade. (Tr. 84, 98-99, 534, 50, 599, 1318). Objective testing from Patrick Balke, Ph.D. indicates that Plaintiff is illiterate. (Tr. 1321-1322). During the relevant 15-year period prior to filing his disability application, Plaintiff worked as "till builder" from 1990 until 2009 when he was terminated. (Tr. 179-185, 534, 678).

Plaintiff and his wife testified at three ALJ hearings and completed function reports for SSA. Plaintiff testified his job ended when a "machine took his place," but shortly before he was let go, he fell on ice and injured himself in his employer's parking lot. (Tr. 184-185). Even while he was working, he had difficulty with a leg problem and missed a lot of work due to asthma. (Tr. 184). Still, he thought he could have worked back then and had looked for work after he lost his job, but nobody would hire him. (Tr. 181-182, 184). His conditions progressively worsened after his job ended in 2009. (Tr. 182). Plaintiff's wife thought Plaintiff's education interfered with his ability to get another job, and she observed a progressive worsening of Plaintiff's condition, including increased swelling in his hands when Plaintiff would do things around the house. (Tr. 200). She noted Plaintiff had an umbilical hernia surgery, and it was hard for him to "bounce

6

back" after the surgery because of pain in his back. (Tr. 200).

Since his alleged disability onset date in July 2010, Plaintiff has not worked due to pain, breathing difficulties, and difficulties using his hands. (Tr. 186-187). He needed to take breaks due to his pain and breathing problems. During the 2018 hearing he had trouble breathing and wheezing due to the cold air, and he was nervous; he had to take a break during the hearing due to trouble talking. (Tr. 103-105). He had asthma and used a rescue inhaler and a nebulizer with Albuterol. (Tr. 164). He had more trouble breathing in cold, rainy weather. (Tr. 66).

Plaintiff's EKG from 2012 showed a bundle branch block, but Plaintiff did not have a lot of cardiology follow-up and did not go to the hospital for chest pains because he could not afford the cost. (Tr. 165, 167). Plaintiff's wife worked and carried the health insurance, but most of their medical bills were out of pocket unless they met the $10,000 deductible due to a surgery. (Tr. 56, 119, 190-199). Plaintiff did not get tests done or receive other medical care because he did not want to create more bills. (Tr. 74, 115, 199). He noted that his medical provider thought he had a mild stroke in the past and that one of his heart chambers "beats slower than the other or something like that". (Tr. 166).

Plaintiff reported he had pain in his lower back up the right side to his shoulder and sometimes had muscle spasms like a Charlie horse in his back. (Tr. 162). He found it too excruciating to lay down to have a recommended MRI of his back, and he needed to wait until they could afford the cost. (Tr. 168). He saw a pain management doctor and took different medications three times a day for muscle spasms which eased his pain a little bit. (Tr. 168-169, 171). He had participated in physical therapy which hurt more; he had tried to do some of the exercises at home, but the majority of it was too excruciating. (Tr. 169). He was told nothing

could be done surgically. (Tr. 169-170).

Plaintiff had trouble using his hands and could not do much with them. (Tr. 162, 186-187). Prior to December 2014, he experienced swelling in his hands and the first three fingers on both hands were numb all the time and felt like they were asleep, and sometimes he had trouble picking things up because he had trouble feeling due to the numbness. (Tr. 197). Some days his hands "puff[ed]" worse than other days, and the more he did the worse his hands swelled. (Tr. 197). Plaintiff's wife confirmed when Plaintiff did things around the house, he had more swelling in his hands. (Tr. 200).

Plaintiff felt mentally limited due to his conditions, and he had trouble concentrating and remembering. (Tr. 189). The only treatment he received for his mental condition was through his family doctor who prescribed Celexa which was discontinued it because it was not helpful. (Tr. 187). He could not spell or retain what he read. (Tr. 186). Plaintiff's wife confirmed the spelling and reading deficits and his need for help. (Tr. 109-113).

Plaintiff estimated he could comfortably sit at one time for about 10 to 15 minutes; after that he started to hurt, get muscle spasms, and needed to move around. (Tr. 172). During all three hearings he needed to stand; he supported himself with his arms while standing because he experienced back pain when he stood straight. (Tr. 52, 104, 168, 194). He estimated he could stand about an hour before he needed to sit down. (Tr. 65, 172). He would walk a "little bit," then get tired and out of breath and need to sit back down. (Tr. 172). He had gained a lot of weight since he stopped working and because he could not exercise and was not as mobile as he used to be. (Tr. 185-186). He could comfortably lift a gallon of milk, an estimated eight to ten pounds. (Tr. 173-174).

As for daily activities, Plaintiff testified he spends most of his day at home helping care for his physically and mentally disabled adult son and performing light housework with breaks. (Tr. 174-175). Plaintiff noted he could care for their son "on his own time" with breaks and did not need to keep to a schedule. (Tr. 203-204). Plaintiff's wife testified that she did the cooking and that they did the dishes together with Plaintiff drying. (Tr. 205). Plaintiff's wife washed the dishes because Plaintiff had trouble gripping and holding onto things and had dropped dishes. (Tr. 206-207). Plaintiff's wife noted Plaintiff had more difficulty concentrating beginning with about a year after he stopped working. (Tr. 205-206). She needed to remind him to take his medication. (Tr. 206). Stress triggered his anxiety and bills were stressful to him. (Tr. 74, 206). He got depressed because he lost his job, could not work, and they had lost their house. (Tr. 118, 206). Plaintiff had worked since he was a teenager, and he was upset he could not work. (Tr. 206).

In support of remand, Plaintiff first argues that the ALJ erred in her evaluation of the medical opinions.[2] ALJs are required to "evaluate every medical opinion" received, regardless of its source. *See* 20 C.F.R. § 404.1527; Social Security Ruling (SSR) 06-3p. The opinion of a treating physician on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and is not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(c)(1); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). If a

---

[2] SSA published notice in 2017 substantially changing the way it evaluates opinion evidence, but those changes are inapplicable in cases such as the present one in which the application for benefits was filed on or before March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5844 (Jan. 18, 2017) (existing policies and rules apply to claims filed on or before March 27, 2017); 20 C.F.R. §§ 404.614, 404.1527; Program Operations Manual System (POMS) § DI 24503.050 Determining the Filing Date for Evaluating Evidence (2016). (Tr. 225-237).

treating physician's opinion is not afforded controlling weight, the ALJ is required to weigh the opinion pursuant to the regulatory "checklist" factors that 20 C.F.R. § 404.1527 prescribes. Those factors include: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) supportability; 4) consistency with the record as a whole; and 5) whether the treating physician was a specialist in the relevant area. *Id*. The failure to apply the factors in 20 C.F.R. § 404.1527(c) in weighing medical opinion evidence is an error of law. *See Scrogham v. Colvin*, 765 F.3d 685, 697-98 (7th Cir. 2014); *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

Plaintiff contends the ALJ erred in rejecting, without well-supported reasons, the medical opinion evidence from treating and examining sources and impermissibly relied on her own lay judgment. Plaintiff argues that this resulted in an unsupported evaluation of the subjective symptom reports, and unsupported findings at steps three and five of the sequential evaluation. Plaintiff also alleges that the ALJ abused her discretion in denying Plaintiff's request to issue a subpoena and to consult a medical expert.

The ALJ held that the state agency medical opinions—which were nearly six years old at the time of the April 2020 decision—were entitled to "little weight" because of new evidence added to the record. (Tr. 27). The non-examining state agency examiners for the Indiana DDB reviewed Plaintiff's claim in June and October 2014, at which time J. Eskonen, M.D. and S. Small, M.D. assessed a residual functional capacity for work at the medium exertional level with avoiding concentrated exposure to heat, cold, odors, dust, gases, and poor ventilation. (Tr. 231-232). In July and October 2014, non-examining psychologists for the Indiana DDB, W.

Shipley, Ph.D., and D. Unversaw, Ph.D., considered Plaintiff's impairments under obsolete mental impairment listings. Under the old version of the listings, they rated Plaintiff as moderately limited in concentration, persistence, or pace—a "B" category that was generally retained in the new mental listings; after completing a mental residual functional capacity rating worksheet, they concluded Plaintiff "appears capable of unskilled work". (Tr. 229, 232-234, 242, 245-247).

The ALJ gave the opinions of the state agency consultants little weight because later evidence supported greater limitations. (Tr. 27). Yet the ALJ also rejected all of the medical opinions, including the opinions of Plaintiff's long-time treating doctor, John Wallace, M.D. (Tr. 26-27). She also rejected the opinion of Patrick Balke, Ph.D., the psychologist who performed extensive testing that demonstrated that Plaintiff's learning disabilities were so significant that he was illiterate. (Tr. 26-27,1318-1323). The ALJ even rejected the favorable opinion evidence from consultative examiners, Dr. Onamusi and Dr. Predina, despite her assertion that she afforded "partial weight" to the "consultative examinations". (Tr. 26-27). Plaintiff asserts that the ALJ relied on speculation and her unsupported lay opinion concerning the medical evidence. Plaintiff notes that the ALJ denied Plaintiff's request to have a medical expert testify and to subpoena Dr. Onamusi. (Tr. 16, 451, 713, 749-750). Plaintiff concludes that the ALJ's approach to the medical evidence created an evidentiary deficit that could only be filled by impermissibly playing doctor.

Plaintiff claims that the ALJ's remarks and rulings also indicate that she inappropriately viewed her role as only correcting the agency's "technical" deficiencies regarding the Title XVI application and was inappropriately deferential to the prior decisions and failed to develop a full and fair record. (Tr. 43-50, 451, 713, 749). Plaintiff points out that his case was remanded and

reassigned to the new ALJ to cure an Appointments Clause violation of the United States Constitution not just to cure a technical deficiency. (Tr. 16, 308, 713).

The ALJ held that highly relevant evidence from Dr. Onamusi who twice examined Plaintiff at the request of the Indiana DDB and opined in 2012 that Plaintiff was limited to "purely sedentary work activities" was "quite dated" and "not pertinent" or of probative value. (Tr. 16, 713). Plaintiff points out that the evidence and opinions during this period were the key to Plaintiff's eligibility for Title II benefits since he needed to prove that he satisfied SSA's criteria for disability between July 25, 2010 and December 31, 2014 (Tr. 430, 467). Confusingly, the ALJ held that Plaintiff's subsequent change of age categories and the remand for "technical reasons" somehow rendered the evidence from 2012 and 2014 too dated and obviated the need for a medical expert. The ALJ apparently thought the age category change and favorable decision on the Title XVI application finding disability as of October 31, 2017 rendered the evidence concerning the Title II period "dated" and "not pertinent".[3]

After rejecting Dr. Onamusi's favorable opinion in the May 2012 exam that Plaintiff was capable of "purely sedentary work," the ALJ claimed she afforded "partial weight" to Dr. Onamusi's consultative exams from May 2012 and June 2014 because the objective findings were "mostly consistent with the overall record". (Tr. 26). However, the state agency medical consultants did not have for their review the May 2012 exam but only had the June 2014 consultative exam. (Tr. 226, 232, 239, 245). Plaintiff argues that the ALJ's review was impermissibly selective and is her own lay view of the evidence. (Tr. 26-27). The Seventh Circuit

---

[3] Plaintiff points out that the ALJ's favorable decision regarding his Title XVI application for SSI is unhelpful to them because his wife's earnings from her job puts them over the resource limit for SSI, meaning that they receive no SSI benefits.

recognizes "rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled… can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014).

The ALJ twice cited Dr. Onamusi's note from the 2014 exam that Plaintiff displayed "disproportionate pain behavior"; apparently, the ALJ thought this fatally undermined all the other medical evidence and opinions as well as the subjective symptom reports pointing to disability. (Tr. 23, 26). Nonetheless, Dr. Onamusi still described Plaintiff as reliable. (Tr. 996). Plaintiff's wife explained that the second exam was much shorter and less thorough because Plaintiff was creating a disturbance in the office due to an asthma attack and a panic attack. (Tr. 190-191, 200-201). In 2014, Dr. Onamusi observed that Plaintiff "appeared to be in distress with hyperventilation throughout the entire exam". (Tr. 997-998). Breathing testing could not be performed, and there was a note that "patient didn't do test…was in distress due to anxiety." (Tr. 1000).

Plaintiff argues that the ALJ failed to reconcile the contradictory evidence in her formulation of Plaintiff's RFC. (Tr. 23). For example, during the May 2012 exam, Plaintiff became "audibly wheezy and mild tachypneic getting on and off the exam table". (Tr. 24, 913). Dr. Landin's exam indicates that Plaintiff had "effort related dyspnea," chest pain, and effort intolerance causing a need to further evaluate his left bundle branch block pattern. (Tr. 919-920). The ALJ has not explained how this evidence undermines Dr. Onamusi's opinion for sedentary work.

Dr. Onamusi also observed that Plaintiff had small nodes involving the DIPs of the hands with tenderness to palpation over all MCP and interphalangeal joints, and moderate tenderness

13

around the CMC joints of the thumbs with grip strength of 25 pounds on the right and 10 pounds

on the left. (Tr. 914). During the 2014 exam grip strength was 5 pounds on the right and 10

pounds on left. (Tr. 997). The ALJ does not explain how the ability to make a fist, lack of

observed swelling during an exam, and reported ability to use the hands for some grasping and

fingering was inconsistent with Dr. Onamusi's opinion limiting Plaintiff to sedentary work. The

ALJ also failed to support her findings that Plaintiff had the ability to use the hands frequently,

*i.e.*, up to two-thirds of an 8-hour day, to lift 20 pounds occasionally and/or 10 pounds frequently.

As noted, the ALJ also refused Plaintiff's request to subpoena Dr. Onamusi to obtain

testimony and clarification about his two exams and his reports which could have cleared up any

issues or doubts. This Court agrees that the ALJ's rationale for denying the subpoena request, *i.e.*,

that the evidence was "too dated" and "not relevant", was illogical.

The ALJ also purported to assign "some weight" to Dr. Predina's consultative

examination. (Tr. 27). After criticizing Dr. Predina's opinion that Plaintiff could not manage his

own finances, the ALJ then found that Dr. Predina's "objective findings" were consistent with the

record and the ALJ's own assessment of "moderate limitation" under the B criteria of the mental

listings and her RFC assessment. (Tr. 27). Yet the ALJ did not state what "objective findings" she

credited nor did she provide any insight as to what findings supported her moderate ratings under

the "B" criteria of the revised mental impairment listings. (Tr. 27). The ALJ also failed to

mention or acknowledge Dr. Predina's diagnosis of "Major Depressive Disorder-Recurrent-

Severe". (Tr. 1007). Under the DSM-V, an impairment is rated as "severe" when there are "many

symptoms in excess of those required to make the diagnoses or several symptoms that are

particularly severe, or symptoms result in marked impairment in social or occupational

14

functioning". The ALJ did not mention this nor explain how a major depressive disorder rated as "severe" (as opposed to mild or moderate) is more consistent with "moderate" limitations under the "B" criteria as opposed to "marked" limitations.

Dr. Predina supported her diagnostic opinion about the severity of Plaintiff's depression and noted symptoms including crying, sadness, forgetfulness, confusion, poor concentration, indecisiveness, eating less, feeling worthless and hopeless, excessive guilt over not being able to work, withdrawal, and loss of interest in pleasurable activities. (Tr. 1004, 1007). Dr. Predina's "General Observations" included a notation that Plaintiff appeared to be in "considerable pain," his affect was flat, his mood suggested feelings of depression, he was tearful at times during the interview, and he appeared to be experiencing some problems with recalling information. (Tr. 1005). Mental status exam findings indicated Plaintiff did not know the current date, the name of the previous President, the name of the Mayor of Fort Wayne, or the name of the Governor of Indiana; he could not describe the route taken to travel to the exam or provide a description of current events; he recalled 0 out of 3 words after a five-minute delay. (Tr. 1005). Plaintiff summed up his depression to Dr. Predina by stating: "I feel like I am not worth anything…I don't know where we are going to live because we have been foreclosed…I can't work and support my family". (Tr. 1004).

The ALJ failed to consider the findings discussed above. Plaintiff argues that a proper evaluation of Dr. Predina's opinions and the record as a whole under the new mental impairment listings criteria demonstrates Plaintiff had at least "marked" limitations, *i.e.*, he is seriously limited in understanding, remembering and applying information and in maintaining concentration, persistence, or pace. 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00E, F. Plaintiff

15

notes that had the ALJ rated these two B criteria domains as "marked", Plaintiff's mental impairments would meet Listing 12.04 under the B criteria. The ALJ also failed to consider whether Plaintiff's impairments in combination, including with his chronic pain, equaled a listing. This requires a medical expert opinion, but the ALJ refused to a call medical expert. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004); SSR 17-2p (To support a finding of medical equivalence at step three the records must contain a prior administrative medical finding supporting medical equivalence, medical expert (ME) evidence obtained at the hearing level supporting medical equivalence, or a report from the Appeals Council (AC) medical support staff supporting the medical equivalence finding.).

The ALJ's step three discussion states that the record contains no evidence from a medical or psychological consultant or medical expert determining the claimant medically equals a listing. (Tr. 21). Yet, the ALJ failed to ensure a medical expert reviewed the updated evidence nor did she consider the evidence in conformity with the significantly revised mental listings. Plaintiff requested an updated medical expert evaluation, but the ALJ denied the request because she "found sufficient evidence to decide the claim". (Tr. 16).

Plaintiff further argues that even if his concentration, persistence, or pace limitations were "moderate" as opposed to "marked," the ALJ failed to account for those limitations in the RFC. The ALJ adopted an RFC that was the equivalent of unskilled work with limited social interaction and a reduced level of reading and writing. (Tr. 22). Yet the state agency psychological consultants determined that Plaintiff was moderately limited in completing a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 232-234, 246-247). The ALJ

16

concluded that Plaintiff was more limited. Yet, except for the limitation with respect to reading and writing, it is not apparent how the ALJ found Plaintiff any more limited with concentration, persistence, or pace. The Seventh Circuit has repeatedly reversed and remanded cases due to the ALJ's failure to incorporate in the hypothetical a finding of a moderate limitation in concentration, persistence, or pace. *See, e.g., Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019). In this case, the ALJ's RFC assessment and hypothetical fail to account for Plaintiff's moderate limitation in completing a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

Not only did the ALJ discard the favorable medical evidence and opinions from the agency's own examining physician, but she also rejected the medical opinion evidence from Plaintiff's long-term treating physician, John Wallace, M.D.  On November 3, 2013, Dr. Wallace completed a medical source statement. (Tr. 946-948). Dr. Wallace reported Plaintiff's diagnoses included chronic back pain and asthma and that he had chronic pain and paresthesia. The signs and symptoms of his impairments included muscle spasm, muscle weakness, weight increase, impaired sleep, abnormal posture, and reduced grip strength. (Tr. 946-947). Dr. Wallace noted Dr. Jenkinson at Orthopedics Northeast had treated Plaintiff, ordered x-rays, and that Plaintiff had taken medications including Gabapentin, Vicodin, and Flexeril for his back but still had pain. (Tr. 946). Plaintiff also used Albuterol and Singular for asthma. (Tr. 946).

 Dr. Wallace opined about various exertional limitations, including that Plaintiff could rarely lift less than 10 pounds in a competitive work situation, had postural limitations, and could not engage in work requiring sustained flexion of the neck. (Tr. 947). Dr. Wallace indicated that

Plaintiff was limited to reaching and handling 5% of the day and fingering for 10% of the day. (Tr. 947). He also indicated Plaintiff should avoid dusty environments. (Tr. 947). Dr. Wallace opined that Plaintiff's pain would frequently interfere with his ability to perform simple tasks; he would need unscheduled breaks; and he would likely miss more than four days of work a month. (Tr. 947-948). According to the vocational expert, consistently missing more than one day each month and being off task 6% or more of the day would not be tolerated. (Tr. 81-82).

The ALJ concluded that Dr. Wallace's medical opinion was entitled to "little weight" and provided the following reasons: (1) except for the opinion about avoiding dusty environments, the opinion was not consistent with the overall record which showed "some degenerative changes in the spine but little treatment beyond oral pain medications"; (2) the claimant did not have extensive pulmonary testing and did not have hospitalizations for asthma exacerbations; (3) the claimant did not have more than minimal treatment for his heart conditions; (4) the claimant did not have more than minimal treatment or testing of his hands; (5) Dr. Wallace's treatment records do not show problems with the neck or indicate such limited use of the hands. (Tr. 26). Plaintiff argues that the ALJ's reasons are not supported by substantial evidence and are contrary to Seventh Circuit case law.

Plaintiff first points out that the ALJ is not a doctor, and she has relied on no contradictory medical opinion that undermines Dr. Wallace's opinion. The ALJ failed to identify other evidence undermining the medical opinions and relied on her own her unsupported medical inference about the significance of the medical evidence and level of treatment. This is impermissible. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) ("The ALJ decided, absent any medical evidence, that Myles's condition was less serious because it was treated only with oral medication and not

with insulin therapy.").

Second, not only did the ALJ engage in impermissible medical speculation that the level of treatment did not support Dr. Wallace's opinions, but she failed to explore the reasons why Plaintiff did not seek more treatment. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference"); *see also* SSR 16-3p (SSA will not consider symptoms inconsistent with evidence on the basis of failure to follow treatment without considering possible reasons for failing to follow treatment). Plaintiff notes that the record contains many explanations for Plaintiff's lack of treatment. Plaintiff's wife described Plaintiff's stress and concern about paying bills after he lost his job of many years. (Tr. 75). Plaintiff's wife was the only one in the household working and she provided their health insurance that had co-pays as well as a deductible of $10,000. (Tr. 119). The ALJ failed to consider that Plaintiff's health insurance was provided through his wife who testified that Plaintiff was very stubborn about going to the hospital and refused to go even when he really should have because he was worried about making more bills. (Tr. 115). Plaintiff and his wife lived "paycheck to paycheck," and they already had bills from Parkview that they could not afford from Plaintiff's wife's surgery. (Tr. 119).

Plaintiff's remarks to Dr. Predina provide further insight on this subject; she noted that Plaintiff summed up his symptoms of depression by stating "I feel like I am not worth anything ... I don't know where we are going to live because we have been foreclosed on ... I can't work and support my family". (Tr. 1004). SSR 16-3p notes that individuals may not be able to afford treatment, and this is a factor that adjudicators need to consider in determining whether the frequency and extent of treatment support an individual's subjective complaints. *See also Craft*,

539 F.3d at 678-79 ("An inability to afford treatment is one reason that can 'provide insight into the individual's credibility.'"). Here, the ALJ should have considered Plaintiff's limitations affording treatment before using this a reason to discount Dr. Wallace's opinion.

Third, the ALJ has claimed that Dr. Wallace's treating records do not show problems with Plaintiff's neck or "such limited use of the hands" (Tr. 26). Most of the evidence related to Plaintiff's neck complaints are within the chiropractic treatment records from Mark Winteregg D.C. at Exhibit 3F. (Tr. 845- 901). Those chiropractic treatment records cover the period from February to April 2012. (Tr. 895). The initial chiropractic assessment in February 2012 reflects that Plaintiff had pain in the low back and between the shoulder blades and a constant neck pain with the severity rated as a 3/10. (Tr. 882-883). Neck range of motion was moderately decreased and painful; C6 reflexes revealed some abnormalities and Dr. Winteregg advised Plaintiff to perform activities that do not exacerbate pain. (Tr. 885-886). Thus, even though Plaintiff's cervical spine problems have not been the focus of his disability, there are records to support the neck symptoms and opinions, albeit not within Dr. Wallace's own treatment records. The ALJ failed to acknowledge those records aside from mentioning Plaintiff's "limited attendance at the chiropractor". (Tr. 24).

Contrary to the ALJ's finding, Plaintiff's hand complaints and limitations are documented through the record. In December 2010, Plaintiff presented to Dr. Wallace with worsening bilateral hand pain; he could not open jars or bottles, and it was hard to wash dishes. (Tr. 818). Dr. Wallace's exam of the bilateral upper extremities revealed decreased sensation in the left-hand index and middle finger with decreased range of motion and grip. (Tr. 819). Plaintiff returned to Dr. Wallace in September 2011 with an asthma flare and back pain and again reported he could

not open jars; he had left thumb pain that was severe at times and right-hand pain and swelling that was at times helped by Aleve. (Tr. 811). Dr. Wallace's exam showed tenderness over the thenar eminence of the left hand and tenderness with range of motion of the thumb. (Tr. 811). The May 2012 consultative exam with Dr. Onamusi also demonstrates problems with the hands and fingers. Plaintiff described a constant and mild to moderate pain, usually with use of the hands, and recurrent swelling involving the joints of the fingers, with stiffness in all of the fingers of both hands. (Tr. 912). An exam of the hands revealed small nodes involving a few of the DIPs and tenderness to palpation over all the MCP and interphalangeal joints, moderate tenderness around the CMC joints of the thumbs bilaterally. (Tr. 914). Grip strength was 25 pounds on the right and 10 pounds on the left. (Tr. 914).

In August 2013 Plaintiff presented to Dr. Wallace; he was depressed because he could not do things he used to do because of asthma, back pain, and swelling of the hands. (Tr. 962-963). Dr. Wallace conducted a disability physical exam to support his opinions: "Tender to palpation over mild thoracic spine to coccyx.  Limited ROM of spine in all directions due to pain. Tender in lower back with shoulder compression.  SLR neg bilat = sensation in legs.  Arms with good ROM but tender with movement of shoulders.  Weak grip bilat. Decreased sensation in first 3 digits of L hand.  Good radial pulses bilat." (Tr. 984-986).

During a second exam with Dr. Onamusi in June 2014, Plaintiff's grip strength was just 5 pounds in the right hand and 10 pounds in the left. (Tr. 997). In August 2014, Plaintiff reported to Joshua Winters, M.D. with Fort Wayne Orthopaedics, that he was having numbness and tingling in the hands, left worse than right, that had been going on 3-1/2 years. (Tr. 1061). A December 2014 exam with Dr. Wallace includes reports of numbness in the first 3 digits of each hand and

on exam Plaintiff had decreased sensation in the tips of the first 3 digits of each hand. (Tr. 110-1102). Physical therapy and pain management records after Plaintiff's date last insured also note ongoing bilateral hand pain that increased with activity and use and decreased with rest and medication. (Tr. 1150, 1208, 1294,1302, 1359, 1364, 1381, 1386, 1392, 1397, 1413). Hand x-rays completed in April 2019 showed bilateral first carpal metacarpal osteoarthrosis and mild soft tissue swelling of both hand with questions of small erosion versus subcortical cysts. (Tr. 1839-1840).

As noted above, the ALJ erred in rejecting the medical opinion evidence from Dr. Wallace which is well-supported by medical findings and is not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527. Plaintiff argues that this opinion, along with the opinion of SSA's own examining physician, Dr. Onamusi, demonstrates that Plaintiff is limited to a reduced range of sedentary work activity and that the Medical Vocational Guidelines Rule 201.09 directs an award of benefits in this case. Plaintiff argues that the regulations support affording great weight to the treating source, Dr. Wallace, and to the opinion of Dr. Onamusi, limiting Plaintiff to sedentary work. Yet, the ALJ erred in failing to apply these factors which is reversible error. *See Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014). Those factors, including the length, nature and extent of Dr. Wallace treatment relationship with Plaintiff weighs in favor of his opinion. Dr. Wallace has been Plaintiff's physician for about 15 years or more, and he evaluated and treated Plaintiff for the medical problems upon which his opinion is based. (Tr. 77). Dr. Wallace also supported his opinions with a contemporaneous disability physical exam including objective findings in that exam. Dr. Wallace's opinion is also generally consistent with the findings and opinions of other examiners, including Dr. Onamusi as discussed above.

The ALJ also dismissed the opinions of Charles Balke, Psy.D. who completed extensive testing in January 2018 with new diagnoses of deficits that relate to the period while Plaintiff was insured for benefits. (Tr. 1318-1323). Dr. Balke administered the Wide Range Achievement Test and on sub-tests Plaintiff scored in the 0.1 percentile for word reading, the 0.2 percentile for sentence completion which is grade equivalent less than kindergarten, 0.3 percentile for spelling which is a grade equivalent of 1.8. (Tr. 1321). Dr. Balke reported that Plaintiff's reading composite score—which is a "highly reliable and comprehensive measure of reading achievement" was worse than 99.8 of others his age and had no grade equivalent. (Tr. 1321). The Nelson-Denny Reading Test yielded a score at the 1st percentile with a grade equivalent of 4.1, and the Integrated Writing Test placed him at or below the second-grade level. (Tr. 1320-1321). Dr. Balke concluded that Plaintiff's performance was within the generally accepted definitions of illiteracy and that it would be difficult to picture him being able to consistently read or write simple messages, such as instructions or inventory lists, especially given the symptoms he experiences with social and performance situations. (Tr. 1322). Like Dr. Predina, Dr. Balke also diagnosed Major Depressive Disorder, Severe. (Tr. 1322). He also diagnosed other conditions, including a specific learning disorder with impairment in reading and impairment in written expression. (Tr. 1322).

Plaintiff points out that Dr. Balke's opinion that Plaintiff is "illiterate" means he qualifies for disability benefits based on the application of the Medical Vocational Guidelines even if Plaintiff had the residual functional capacity to perform light work. *See* Medical Vocational Rule 202.09; 20 C.F.R § 404.1564(b)(1) ("Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or

inventory lists even though the person can sign his or her name.").

Yet, like the other opinions that would result in a favorable finding on the Title II claim, the ALJ concluded that Dr. Balke's opinions were entitled to "little weight". (Tr. 26-27). First, the ALJ reasoned that the evaluation was of "limited relevance" in assessing Plaintiff's abilities while he was insured for benefits since it was performed more than three years after Plaintiff's date last insured. (Tr. 26). Plaintiff points out that although the testing was completed after Plaintiff last insured for benefits, the measures of Plaintiff's literacy relate to the period while he was insured for benefits, as well as the to entirety of his adult life. Plaintiff's learning impairments are long-standing, and he and his wife reported these difficulties throughout the relevant period. Plaintiff dropped out of school after the 9th grade, repeated poor grades in school, had been retained, and was never able to obtain his GED. Next, the ALJ implied the exam was not reliable because it was performed for a disability appeal, but the ALJ has failed to identify even a scintilla of evidence support this. (Tr. 26). The ALJ claimed that the results were undermined because Plaintiff's wife "read and interpreted test items". (Tr. 26). Dr. Balke indicated Plaintiff assisted with reading the "inventory completion" items, not the "test items" (Tr. 1320). Dr. Balke's report does not state or infer that Plaintiff's wife read the Wide Range Achievement Test, Nelson-Denny Reading Test, or the Integrated Writing Test to Plaintiff or that the results were in any way compromised or in doubt. (Tr. 26, 1320-1323).

The ALJ also held that the results were inconsistent with Plaintiff's ability to drive and to complete function reports for SSA. (Tr. 21, 26). Yet, the ALJ failed to confront contradictory evidence. Plaintiff reported he got a lot of "Fs" in school, had been held back in school, received extra help, and ultimately quit school during the 10th grade to work and help his parents

24

financially; he did not think he could make it through the higher grades due to his difficulties

reading and understanding. (Tr. 99, 210-211). He had tried to obtain his GED but could not pass.

(Tr. 211). He had never filled out a job application on his own, and his wife and a friend helped

him with that. (Tr. 99). His wife had to help him with the forms for Social Security. (Tr.

101-102). Plaintiff's wife usually accompanied him to doctor appointments; he did not like to go

by himself because he was afraid there would be paperwork he would be unable to complete. (Tr.

117). His past job at Colwell involved measuring, not reading. (Tr. 100). He could write a check

by copying a sample his wife made for him. (Tr. 100). He could follow a recipe if it had pictures

and some simple words he knew like eggs and milk. (Tr. 101). Plaintiff's wife confirmed his

spelling and reading deficits and his need for help. (Tr. 109-113). When driving, he navigated by

landmarks as opposed to street signs. (Tr. 114).

The Court finds this case troubling. To recap, Plaintiff applied for Title II benefits in

December of 2013, due to an inability to work since July of 2010.  A hearing was held in May of

2016, resulting in a denial of benefits, which decision was remanded by the Appeals Council.  In

January of 2018, a new hearing was held, again resulting in a denial of benefits, which was again

remanded by the Appeals Council.  A new hearing was held in March 2020, before a different

ALJ this time, and benefits were again denied.  In the third decision, which is before this Court,

the ALJ incorrectly stated that "the case was remanded on technical errors"  and used that basis to

refuse Plaintiff's request for a medical expert. The ALJ also refused to subpoena a doctor who

had provided a dispositive opinion in 2012, ruling that the doctor's opinion was "outdated", when

the opinion was completely relevant to the dates at issue and only appeared outdated because the

Agency had taken so long to get through its review.  The ALJ also ignored uncontroverted

evidence from the Agency's own examining physician, Dr. Onamusi, as well as from Plaintiff's long-term treating physician, Dr. Wallace, that Plaintiff is limited to no more than sedentary work which, pursuant to the Medical-Vocational Guidelines Rule 201.09, compels a finding of disability.  Likewise, the ALJ ignored the uncontroverted evidence, set forth in Dr. Balke's opinion, that Plaintiff is illiterate which pursuant to Medical-Vocational Guidelines Rule 202.09, also compels a finding of disability.

Clearly, to remand this case for further proceedings at the administrative level would be futile. This Court thus finds that a remand for benefits is appropriate.

Conclusion

On the basis of the foregoing, the decision of the Commissioner is hereby REVERSED and REMANDED FOR AN AWARD OF BENEFITS, commencing at least as early as May 12, 2012.

Entered: January 25, 2022.

s/ William C.  Lee
William C. Lee, Judge
United States District Court